878

WHITE COUNTY GUARANTY S&L ASSN. *v.*
SEARCY FED. S&L ASSN. ET AL

5-4086                                          410 S. W. 2d 760

Opinion delivered January 30, 1967

*Spitzberg, Bonner, Mitchell & Hays;* By: *Allan W. Horne,* for appellant.

*Charles E. Yingling Jr.* and *George P. Eldridge*

and *Kaneaster Hodges* and *Murphy & Arnold* and *Smith, Williams, Friday & Bowen;* By: *Ben Allen,* for appellee.

J. Fred Jones, Justice. This case involves the formation of a permanent stock savings and loan association under Act No. 227 of the Acts of Arkansas for 1963.

The State Savings and Loan Association Board and its Supervisor, approved the application of appellants for a charter. Upon appeal, the Circuit Court reversed the Board, and the precise question before us on appeal is whether or not there was any substantial evidence to support the order of the Board.

In 1964, a group of individual citizens in and around Searcy, Arkansas, associated together under the name of "White County Guaranty Savings and Loan Association," and attempted to acquire the status of a legal entity with authority to operate as a permanent stock savings and loan association under charter to be issued by the State Savings and Loan Association Board under and pursuant to Act 227 of the Acts of Arkansas for 1963, Ark. Stat. Ann. § 67-1801-1862 (Repl. 1966).

Two applications were filed with the Board. The first application was filed in 1964, and included the names of thirteen individuals who would constitute the proposed board of directors, and the names of eighty-five individuals who had subscribed to capital stock, and paid in the sum of $181,244.00, which was placed on time deposit in banks. On December 14, 1964, on grounds other than insufficiency of the stock subscriptions, this application was denied.

After this application was denied by the Board, the subscribers to stock were notified that efforts to obtain a charter would be continued, but that anyone desiring a refund of any amount paid on subscription, could obtain same upon request. A few of the original subscrib-

ers claimed refunds in amounts totaling $19,413.02, and their names were stricken from the subscription list. After refunds on subscriptions and the payment of other expenses, there remained on deposit in Searcy banks the sum of $153,834.54 in paid-in subscriptions, when on January 14, 1965, a second application was filed.

The record reveals little change in the two applications except that the names of two of the "proposed chairmen of the incorporators and initial board of directors," in the first application were left off in the second application. It appears that the original copy of the schedule or list of subscribers to the permanent capital stock filed with the first application was copied and filed as the schedule in the second application, the only difference being that the first was an original copy and the second was a duplicate with the names of those who had withdrawn and claimed their refunds stricken out.

Both applications were vigorously opposed by other lending institutions in the White County area and hearings were had on both applications. The second application was approved and a certificate of authority was issued to the White County Guaranty Savings and Loan Association.

The Circuit Court, on appeal from the decision of the Board, found that there was no substantial evidence of applicant's compliance with the necessary statutory prerequisites concerning subscriptions to savings accounts and permanent capital stock to sustain the Board's findings that the subscriptions were sufficient to justify the initial successful operation of a savings and loan association as required by law, and the Circuit Court reversed the Board on these findings, but in all other respects, the findings of the Board were affirmed.

The Circuit Court then entered its judgment remanding the cause to the Arkansas Savings and Loan

Association Board with directions to dismiss the application. The applicant, White County Guaranty Savings and Loan Association, on appeal to this Court, designates one point upon which it relies, as follows:

"The Circuit Court erred in holding that there was no substantial evidence to support the finding of the Arkansas Savings and Loan Board that the subscriptions to savings accounts and permanent capital stock of Appellant were sufficient."

The protestants before the Board, and appellees here, contended before the Board that savings accounts had not been subscribed from individuals in the aggregate number and amount sufficient to justify the successful operation of a savings and loan association, and that permanent capital stock had not been subscribed as required by law. They directed their most pointed attack at the legal sufficiency of stock subscriptions, and argued that stock subscriptions must be in writing and that an original signed subscription list must, as a matter of law, be filed with each application for a charter. They contended on appeal to the Circuit Court, and they contend on the appeal here, that there was no substantial evidence to support the findings and order of the Board.

It appears clear that in the absence of statute or charter provisions to the contrary, stock subscriptions may be written or oral or in any other form that would satisfy the requirements of a valid contract.

In CJS § 295 we find the following:

"In the absence of a charter or statutory provision to the contrary, a stock subscription need not be in any particular form or made in any particular mode, as long as there is a present intention to contract with the corporation and the agreement is complete and definite." Citing *Gibson* v. *Oswalt*, 257 N. W. 825, 269 Mich. 300.

In *Rutenbeck* v. *Hohn*, 121 N. W. 698, the Supreme Court of Iowa said:

"While the strict definition of the word 'subscribe' or 'subscription' involves the idea of a written signature, yet by common usage it is often employed to include an agreement, written or oral, to give or pay some amount to a designed purpose, more usually, perhaps, to some purpose for the promotion of which numerous persons are uniting their means and their efforts." See also *Mills* v. *Friedman*, 111 Misc. 253, 181 N. Y. S. 285, 292, *Jones* v. *Ronkin*, 19 N. M. 56, 140 p. 1120, 1121.

The literal definition of the word "subscribe," of course, is *to write under*, (Black's Law Dictionary) but the word as used in the context here has also been defined as equivalent to "agree to pay." *Strong* v. *Eldridge*, 8 Wash. 595, 37 Pas. 697.

We now examine our own statutory requirements for the formation of a savings and loan association, and then the evidence before the Board in determining whether or not the Board's findings were based on substantial evidence.

Our own statutes are not perfectly clear on whether or not subscriptions to stock in a *savings and loan association* to be chartered under Act 277 of 1963, Ark. Stat. § 67-1801-1802 must be in writing. The *Business Corporation Act,* Act 576 of the Acts of Arkansas for 1965, Ark. Stat. § 64-203 does so provide, but that same act § 64-103 provides as follows:

A. "Corporations may be organized under this act [chapters 1-10 of this title] for any lawful purposes *except that where another statute of this State * * * requires that corporations of any designated class be organized thereunder, corporations*

*of that designated class shall be organized under such other statute and shall be subject to the provisions thereof."*

B. "In respect to all corporations of *any designated class* that could be organized under this act *but which are subject to the provisions of any other statute or statutes placing restrictions or conditions on the organization of such* corporations, or *providing for the regulation of such corporations after organization,* the provisions of this act shall apply to such corporations only to the extent that this act is not inconsistent with the provisions of such other statute or statutes; this act not being intended to repeal, amend or qualify any statute of such character.

C. "A corporation originally incorporated under a general business corporation statute of this State, *but belonging to a class whereunder the organizational filing procedures have been transferred to some state office or agency other than the Secretary of State, will not be subjected to the provisions of this act."* (emphasis supplied)

Act 227, under which appellant's applications were made, is a highly regulatory act and vests authority in a five member board and a supervisor to charter and regulate savings and loan associations under the supervision of the State Securities Commissioner. This act is not long, its provisions are not ambiguous and the organizational procedure under its terms is not complicated. It makes no provision as to manner or form of stock subscriptions.

The organizational section of Ark. Stat. Ann. § 67-1816 (Repl. 1966) simply provides as follows:

"Application for a charter for a savings and loan

association may be made by ten [10] or more citizens of this State (hereinafter referred to as incorporators) by tendering to the Supervisor, along with the prescribed filing fee, an application *consisting of the following*:

(1) Two [2] copies of the articles of incorporation for the proposed association stating:

(a) The name and the site of the principal office of the association;

(b) The names and addresses of the incorporators;

(c) The name and address of the resident agent for service of process on the association;

(d) The terms of the corporate existence, which may be either perpetual or limited to a fixed number of years;

(e) Whether the association will carry on its business as a mutual association or as a permanent stock association;

(f) For a permanent stock association the number of shares of permanent stock authorized and the par value of each share.

(2) *A statement as to* (i) *the amount, if any, of permanent stock* which has been subscribed and paid for at the time of filing, (ii) the names and addresses of such subscribers and the amount subscribed by each, (iii) *the names, addresses and amounts of savings accounts which have been subscribed,* and (iv) the amount of paid-up surplus or expense fund with which the association will commence business.

(3) Two [2] copies of the by-laws under which the association proposes to operate.

(4) The names and addresses of the chairman of the incorporators, the proposed members of the board of directors and the proposed officers.

(5) Such other information in regard to the pro-

posed association and its operation as may be required by the Supervisor.

The articles of incorporation and all statements of fact tendered to the Supervisor in connection with an application for charter shall be subscribed and sworn to under the sanction of an oath, or such affirmation as is by law equivalent to an oath, made before an officer authorized to administer oaths." (emphasis supplied)

Appellees argue that when the first application was denied by the Board, that the applicants or proposed incorporators ceased to exist as an organization, and the subscriptions filed with the application terminated by operation of law, and that when the second application filed by other incorporators with different officers and directors, with different proposed stockholders, at a different date, there must be filed or provided new and different stock subscriptions and savings account subscriptions.

The facts of record in this case do not sustain appellees in their argument. The record in this case reveals that there were nineteen incorporators in the first application, and it appears to be conceded by all parties concerned, that this application as to stock subscriptions, as well as subscriptions to savings accounts, fully met all statutory requirements. The nineteen citizens who made the first application as incorporators, alone subscribed 87,750 shares and paid in $104,000.00 as reflected in the application itself.

Between the first and second applications three of the original nineteen withdrew and did not participate in the second application but *the remaining sixteen* made the second application. The three applicants in the first application who did not participate in the second, had subscribed to 12,000 shares of capital stock in the amount of $14,400.00, leaving 75,750 shares subscribed by the sixteen who made the second application.

One of the applicants in the first application raised his subscription in the second application from 5,000 shares to 6,000 shares, making a total of 76,750 shares (erroneously totaled in transcript as 86,750) in the amount of $92,000.00 subscribed by the applicant *incorporators alone* in the second application.

Even if we should hold that the applicant incorporators were required to file new and different stock *subscriptions* with their second application rather than a *statement as to the amount,* if any, of permanent stock *which had been subscribed and paid for* at the time of filing, as required by paragraph two [2] of Ark. Stat. § 67-1816 (*Supra*), we are unable to see how the ten incorporators *who actually signed the application under oath* as proposed members of the board of directors, and who had between themselves, subscribed 60,250 shares in the amount of $72,300.00, could have added anything to their oath by writing out, or signing and filing, with the second application, a new and additional separate subscription contract.

In 18 CJS § 298, p. 789, is found the following:

"If a subscriber, with knowledge of the facts, expressly ratifies the subscription or so acts that a ratification or a waiver of objection may be applied, he cannot afterward avoid liability on the ground that the corporation has not been formed with powers contemplated or that it is otherwise not the same corporation as that contemplated by the subscription agreement." Citing *Flournoy* v. *Highland Hotel Company,* 153 S. E. 26, 170 G. A. 467.

"Where parties subscribed for stock in a corporation to be thereafter organized, it is not essential that the corporation shall be organized by the parties to the agreement or their representatives unless it is so provided at the subcription." Citing *Avon Springs Sanitorium Company* v. *Weed,* 104

N. Y. S. 58, 119 App. Div. 560 reversed, 82 N. E. 1123, 189 N. Y. 557.

And at 18 C. J. S. 294: "Preliminary subscription of stock may be made by signing the articles of incorporation, in which case they are enforceable only against those who sign." Citing *Shiffer* v. *Akenbrook*, 130 N. E. 241.

Appellees direct our attention to Arkansas Statutes § 67-1830 and argue that before this second application should be approved, there should be sufficient subscribed savings accounts from individuals, filed with the second application, that would justify the initial successful operation of such association. A great deal of discretion is placed in the Board by the legislature, and as to savings accounts, Ark. Stat. § 67-1830 reads as follows:

"As a prerequisite to approval of any application for a proposed permanent stock association, the incorporators must *show to the satisfaction of the Board* subscribed savings accounts from individuals in the aggregate number and amount *which in the opinion of the Board* will justify the initial successful operation of such association." (emphasis supplied)

When an application for charter has been made by a group of citizens of Arkansas under Act 277, and the application is denied, we find nothing in the Act, by reference or otherwise, that could prevent ten or more members of this same group from making a second application for a charter.

The parties seem agreed that $75,000.00 in paid-in permanent capital stock subscriptions was the required minimum in this case. It seems undisputed that 80,522 shares of capital stock have been subscribed and there has been paid in and is now on time deposit in two

Searcy banks, the sum of $153,712.03 with which to pay for the stock when certificates can be issued. This is more than twice the amount required under the law in this case.

In the first application 216 individuals subscribed $225,010.00 to the *savings accounts*. Twenty-one of this number testified before the Board at the hearing on the second application that they alone would deposit amounts totaling $293,500.00 in savings accounts with appellant, if and when, a charter is granted.

If appellees interpret § 67-1830 *Supra* to mean that the incorporators must show to the Board *subscribed contracts* for savings accounts before the application can be approved, we do not agree with that interpretation. We think the legislature intended that the incorporators must show to the *satisfaction of the Board* that a sufficient number of individuals have agreed to open savings accounts in sufficient amounts *which in the opinion of the Board* will justify the initial successful operation of the association.

It must be remembered that in the formation of a savings and loan association under Act 227, unlike the formation of some business corporations of another class, the amount subscribed for permanent capital stock in savings and loan association stock subscriptions must be paid in before an application is approved, Ark. Stat. § 67-1819, and the permanent capital stock must be *fully paid for in cash in advance of issuance*. Ark. Stat. & 67-1818.

We find, and so hold, that the action of the Board in approving the application was supported by substantial evidence.

The judgment of the trial court is reversed and this cause remanded with directions to remand to the Board for further procedure not inconsistent with this opinion.

Reversed and remanded.

Harris, C. J., dissents.

Brown, J., not participating.