# ARKANSAS SAVINGS & LOAN BOARD
## *v.* Jerome Kee SOUTHERLAND et al

73-251                    508 S.W. 2d 326

Opinion delivered April 29, 1974

*John Selig* and *Spitzburg, Mitchell & Hays*, by: *John P. Gill*, for appellant.

*Stubblefield & Matthews*, by: *Charles D. Matthews*, for appellees.

JOHN A. FOGLEMAN, Justice. The circuit court reversed the Arkansas Savings & Loan Board's denial of a

charter to appellees for their proposed North Central Arkansas Savings & Loan Association at Mountain View. The court's action was based upon its finding that the decision of the board was not based upon substantial evidence. The board had found that the application met all requisites for the grant of a charter except for its findings that there was not a public need for the proposed association at the time and that the volume of business in the area in which its business would be conducted was not sufficient to indicate a successful operation. Appellant raises questions as to the timeliness of the appeal to the circuit court by appellees and as to the correctness of the circuit court's findings relative to public need, but we need not consider either of these questions because we find substantial evidence to support the board's finding that the volume of business to be anticipated was not sufficient to indicate a successful operation.

In reviewing the circuit court action there are certain basic principles which must constantly be kept in mind. One of the prime requisites for the grant of a charter is a reasonable probability of a successful operation. This probability is dependent upon the volume of business to be anticipated. Ark. Stat. Ann. § 67-1824(3) (Repl. 1966). Two of the basic essentials are sufficient savings deposits and an adequate market for sound loans. In considering applications for a charter, the board carries a heavy responsibility. It is very similar to that of the State Banking Board which we had occasion to emphasize in *Piggott State Bank* v. *State Bank Board*, 242 Ark. 828, 416 S.W. 2d 291. The close relationship of the business to the public welfare requires that the state see that those who entrust their savings to these institutions are adequately protected. To that end some agency, such as this board, must be vested with broad powers and wide discretion on questions such as those presented here. *White County Guaranty Savings & Loan Assn.* v. *Searcy Federal Savings & Loan Assn.*, 241 Ark. 878, 410 S.W. 2d 760. The duty of determining whether a charter should be granted is not vested in this court nor in the reviewing circuit court. That responsibility rests upon appellant, whose members presumably possess a degree of expertise in such matters. See Ark. Stat. Ann. § 67-1805 (Repl. 1966). It is the board's duty to make certain factual determinations and the collective expertise of the board members must be respected to the extent that the judgment of the courts cannot be substituted for that of the

board. The courts are concluded by the board's findings, if they are supported by substantial evidence. Ark. Stat. Ann. § 67-1811 (Repl. 1966); *Heber Springs Savings & Loan Assn.* v. *Cleburne County Bank,* 240 Ark. 759, 402 S.W. 2d 636.

Appellees' brief advances a persuasive argument in behalf of the application; however, it is addressed, to some extent, to the credibility of adverse witnesses, but, for the most part, to the substantiality of the evidence in support of their application and the relative weakness of the evidence of the protestants. We must reverse the trial court, however, because we find substantial evidence to support the board's action, at least as to the anticipated volume of business.

In our review of the testimony, we find most of it to be sheer speculation and conjecture, or, at best, mere conclusions of the witnesses based not on facts of substance, but upon the usual generalities expressive of either unbounded optimism or grave doubt, depending upon the interest of the one testifying. All such testimony, of course, must be discarded in searching the record for substantial evidence. The experts, as could be anticipated, each did his best, short of outright advocacy, to support the position of the party by whom he was employed. Most of the evidence that could be considered substantial, however, came from these witnesses.

Two exhibits to the application relate particularly to the question we consider. The first is Exhibit B, entitled "Economic Data in Support of an Application for a Savings & Loan Association to be Located in Mountain View, Arkansas" as amended, and Exhibit F—"Proposed Operating Budget for the First 12 Months of Operation." The latter indicated a gross operating income of $80,246, operating expense of $38,180, interest charges of $50,328 and a net operating loss of $8,262. The budget was based upon estimates that total savings deposited would range from $340,-000 at the end of the first month to $1,500,000 at the end of the first year. The primary service area indicated was Stone County. The secondary area included certain neighboring townships in Van Buren, Izard, and Searcy Counties.

Most of the enthusiastic predictions made by the applicants and the few witnesses in their behalf who were not

proposed officers or subscribing stockholders are based upon the anticipated effect of the development of Blanchard Springs Caverns and the Ozark Folk Cultural Center, and the belief that this would produce a great increase in tourist business. There was also testimony that people were coming to the area for retirement.

Some of the evidence that affords support to the board's finding actually came from the applicants and their witnesses. For example, there are only three motels in Stone County with a total of 40 units, but the operator of the largest had only one-half occupancy in the winter. Most of his occupancy then was by construction workers at the cultural center and the cave, both of which were nearing completion. He had no plans for expansion. A majority of the inquiries a real estate broker was "beginning" to have was for small acreages, homesites and subdivision lots for retirement sites in the applicants' proposed service area. Most of the local construction qualifies for low income financing by Farmers Home Administration. The majority of that being done or anticipated at the time was so financed. A builder whose work was centered in Stone County did not know that a savings and loan association would help his business. Growth in the area the last few years had been rather slow, compared to the "outside" area. The operator of a Mountain View sawmill had no present plans for expansion. The Federal Housing Administration had been reluctant to consider loans in Van Buren County because of the unlikelihood of resale of houses securing loans that might become delinquent. Clinton, the Van Buren County seat, has more business connections with Conway and Morrilton that any other particular area. These nonexpert witnesses, with the exception of the one proposed as secretary of the planned association, could not or did not attempt to give any estimate or basis for estimation of the deposits which might be anticipated or the volume of loans for which the proposed institution might successfully compete. The witness proposed as secretary said that savings deposits amounting to $470,000 had been subscribed.

The owner of a craft shop engaged in the manufacture of musical instruments and the sale of handicraft products was a member of the Rackensack and vice-president of the Ozark

Foothills Handicraft Guild. He did not know of any persons coming into the area to open a craft business, or of any retail operations that would be involved in the center or the caverns, other than local craftsmen, most of whom were Guild members. From reports of sales to the Guild by its 265 members, he found that the income of those engaged in the production and sale of "handicrafts" ranged from $200 to $5,000 per person per year. Although there were more sales outside the Guild than in it, he did not know of any person who made more than $5,000 per year from sales of these products. He had been in business for five years and employed five people, all of whom came from outside the area. He did not know of anyone else engaged in full-time "making crafts" in Stone County.

The general manager of the Ozark Folk Culture Center, who had lived in Mountain View for 11 years and had been its mayor for 4 years, testified that the object of the center was the preservation of the traditional folk art, crafts and music of the region. According to him, Stone County was chosen as the site of the project because its crafts and music had remained unchanged for more than 50 years due to the remoteness of the area. He did not want musicians from outside the Ozarks to come in. He anticipated that only 70 people would be employed at the Center, of which 15 would be brought in from outside the immediate area. He had seen several projections made by various study groups, including studies by the United States Forestry Service and one by the State Parks Department, but none that projected any large increase in the number of permanent residents of the area, although a tremendous influx of transitory visitors was predicted. Although he felt there would be a need for more commercial facilities, he knew of no Stone County residents developing them. By comparison with his observations of Gatlinburg, Tennessee, he guessed that they would be established by people who would live elsewhere.

The president of the Bank of Mountain View testified that the economy of the area was based principally on production of beef cattle, supplemented by a trailer business, two small factories, one employing 350 people and the other 40, and a growing tourist industry. His bank had assisted in financing one of the factories, due to the fact that all of the tax

millage authorized by Constitutional Amendment 49 had been utilized. He testified that, during the first 10 months of the year (1972), only 10 loans had been made by savings and loan associations in Stone County, and that his bank had furnished the interim construction financing and processed applications on nine of them. He said the bank then had four interim construction financing commitments. The percentage of deposits in loans at the bank had decreased from 58 to 51. He pointed out that the population of Mountain View was approximately 900 in 1960 and that an increase of 600 shown by a 1965 special census was attributable to an intervening annexation to the city.

Dr. Lewis Amos, an economist at the University of Tennessee, was employed by the applicants to compile the data contained in their Exhibit B, a supplement thereto, and the proposed operating budget. He was assisted by his associate, Dr. Mark Westerland. He concluded that "There is better than a reasonable probability of success and profitability of the proposed facility." Most of his testimony, however, was devoted to demonstration of a public need. He made the general statement that the gross amount of loan business was growing in the service area and could be expected to increase at a faster rate. The service area indicated had a total population of 18,500. Between 1960 and 1970, population had only increased by 1,504. 14.5% of the population is over 65 years of age. Projections of per capita income for 1980, he related, ranged from $2,281 to $3,030. He found 31 of 719 housing units vacant in Mountain View. He expressed the opinion, based upon the United States average savings amounting to 8% of total personal income, that by 1980, this would amount to $5,000,000 annually in Stone County, and that, on the basis of 34% of all over-the-counter savings in 1971 in savings and loan associations, the service area should have $14,000,000 in savings and loan institutions. In one economic indicator, automobile registration, he found Stone County slightly behind the remainder of the State. He admitted that if there were an error in his data, his projection would be erroneous. In making his projections in the secondary service area he applied the Van Buren County averages to the townships in that county. He found an 8% unemployment rate in Van Buren County (as opposed to 5% in the state). He conceded that Mountain View itself could not support the institution.

Dr. Charles Venus, an Arkansas economist, testified on behalf of the protestant. He felt that the information submitted with the application was erroneous and misleading. He pointed out that, aside from 600 people who resided in the area annexed to Mountain View, there was a 10-year population increase in that city of only 280, or an average of 28 persons or 7 families per year between 1960 and 1970. This would require 7 new houses there per year. He pointed out the fallacy in projecting percentages where the beginning basis was small. He added the two prime sources of nonworking income, government and transfer payments (such as social security and welfare payments), and found that slightly less than one-half of total income in Stone County came from these sources. To him, this was an indication that the county was very poor. He emphasized the premise that the federal government had invested considerable money in the caverns and the folk center in an effort to afford local people with employment because of the existing high unemployment rate. Consequently, he said, new jobs did not mean new people. He testified that the figure of $3,400 shown in the supplemental economic data supporting the application as average annual earnings was based upon an erroneous premise, i.e., that it was obtained by dividing the total payroll by the total covered employment. According to him, this method excluded those employments not covered under the Arkansas Employment Security Law such as agricultural workers, self-employed persons, unpaid family workers, in-state railroad employees, domestic servants and non-profit organization employees, generally considered the lower paid employment. Thus, he said, both the figures in this supplement and the actual average earnings in the county were well below the accepted United States poverty level of $3,450 for all families and $3,735 for a family of four. He also pointed out errors in the applicants' table of mortage loans, which, in his opinion made it undependable.

Dr. Venus said that a correct projection with reference to savings of personal income which might be expected to be captured by the proposed savings and loan association in Stone County in 1973 amounted to only $445,946, assuming that the total savings would amount to 8.8% and the portion going into savings and loan associations to be 34%. According to Dr. Venus, by typical definition, 75% of the business is

generated in the primary service area. He stated that in order to reach $1,500,000, the projected amount of savings on which applicants' operating budget was based, it would be necessary for them to get 130% of the total savings in Stone County consisting of demand deposits, time deposits and all of the growth deposits of the Bank of Mountain View. It was his opinion the savings base in the area simply would not grow fast enough to support an independent savings and loan association for some years to come and, considering the credit situation for the next year, there was an excellent chance for the institution to lose money for four or five years.

We cannot say that this evidence when considered as a whole did not constitute substantial evidence to support the board's conclusion. Even though we might well conclude that there was substantial evidence to support the application, we must reverse the circuit court and affirm the board.

HARRIS, C.J., dissents.

HOLT, J., not participating.