## ARKANSAS SAVINGS AND LOAN ASSOCIATION BOARD et al *v.* GRANT COUNTY SAVINGS AND LOAN ASSOCIATION

74-35                                          510 S.W. 2d 863

### Opinion delivered July 1, 1974

*Harold E. Anderson Jr.,* for appellants.

*Wright, Lindsey & Jennings* and *John W. Cole,* for appellee.

CONLEY BYRD, Justice. Appellee Grant County Savings and Loan Association filed an application with Appellant Arkansas Savings and Loan Association Board for a charter to operate a savings and loan association in Sheridan. On February 21, 1973, when there was one vacancy on the Board, the Board by a two to two vote denied appellee's application for a charter. Thereafter, the Board permitted appellee to adduce additional evidence and at the public meeting on August 21, 1973, the Board by a two to three vote again denied the application. One of the original members who had voted for the granting of the charter at the February 21st meeting, first stated that he voted the same way, but subsequently, clarified his statement to show that he was voting to deny the charter. The written findings of the Board, being little more than conclusions following the language of Ark. Stat. Ann. § 67-1824, do not specifically state the reasons for the denial of the charter. The findings did conclude, however, that appellees had met all of the statutory prerequisites for the issuance of a charter except as follows:

> "3. There is not a public need at the present time for the proposed association and the volume of business in the areas in which the association would conduct its

business is not sufficient to indicate a successful operation."

The circuit court on appeal reversed the Board and directed that a charter should be issued. For reversal the Board, among other things, contends that the circuit court erred in finding that there was not any substantial evidence to support the Board's decision.

Appellees produced two expert witnesses, Windell R. Adams and Dr. Charles Venus, who testified that there was a savings potential sufficient to grant a savings and loan charter in Grant County. The statistics show that there is only one commercial bank in Grant County and that for the period from 1960 to 1970, the deposits in that bank increased 330.7% as compared to a statewide gain of only 140.6%. During the same period the county had a population gain of 17% compared to a statewide gain of 7.7%. The county for the same period had a housing increase of 21.4% compared to a statewide increase of 14.6%. The value added by manufacturing had a gain of 189.3% compared to 62% for the state as a whole.

The president of the Grant County Bank of Sheridan, an intervening protestant, showed that the demand deposits of his bank were $2.8 million in 1968; $3.1 million in 1969; $3.4 million in 1970; $4.1 million in 1971; and over five million for 1972. Time deposits were $2.1 million in 1968; $3.2 million in 1969; $3.6 million in 1970; $4.1 million in 1971; and that for the period from January 1st through July 18, 1972 it had $5.3 million.

The Appellee's proposed chairman testified that there was $2,272,798.07, loaned for residential mortgages in the county for 1970, and of that amount $405,965.88 was made by savings and loan associations from outside of Grant County. In 1971, there was a total of $2,964,154.55 in residential mortgages and of that total savings and loans made $615,-011.60. In 1972, there was a total of $3,256,154.95 in residential mortgages and of that total savings and loans made $1,-073,572.20. From January 1, 1973, through August 14, 1973, savings and loans had mortgages on record for $1,002,425.00.

The president of the Grant County Bank of Sheridan quite candidly stated that most of his bank's real estate mortgages were for five years or less and that his bank could not meet the total loan volume demand for residential housing.

To counteract this showing, the Board relies upon facts brought out on cross-examination. One such fact is that Mr. P. A. Reader testified on direct that the community of Leola had a remarkable growth. On cross-examination it was shown that Leola had a population gain according to the U. S. Census Report of only 79 people from 1960 to 1970. Another such instance involved Mr. B. J. Benning who admitted on cross-examination that Prattsville according to the U. S. Census Report had a zero growth for the period from 1960 to 1970. We can find no substance in the Board's contention. It appears that the witnesses were speaking of the growth of their communities while the census figures may have been taken entirely along the incorporated limits of the towns.

Other factors that the Board relies upon are the lack of a public transit system, the unemployment rate and the commuting of workers to adjoining counties. The Board in its argument here wishes to overlook the evidence that it permitted to be presented upon rehearing. That evidence shows an increase in residential mortgages by savings and loan associations from without the county from $405,965.88 in 1970, to over a million dollars in 1972. Other evidence showed an increase of time deposits in the county from $2.8 million in 1968 to $5.3 million by July 18, 1972. When this indicia of growth is considered despite the alleged deficiencies of which the Board mentions, it is difficult to understand why the Board was not somewhat arbitrary in considering the alleged deficiencies as substantial evidence.

Neither can we find any merit in the suggestion that the volume of business in the area is not sufficient to indicate a successful operation. Mr. Daniel B. Howard, a *C.P.A.,* was the only witness to touch upon this issue. At a time when the time deposit commitments were only $367,500, he projected a net income of $1,906.00. Of course this picture had greatly in-

creased in favor of appellees by the time of the rehearing which then showed time deposit commitments of $1,000,000.

Affirmed.

FOGLEMAN, J., dissents.

JOHN A. FOGLEMAN, Justice, dissenting. This is another case in which I have a very strong feeling that this court, as well as the trial court, has erroneously enlarged the scope of judicial review by weighing the evidence before an administrative agency to determine the preponderance, rather than determining whether there was any substantial evidence to support the finding of fact made by the administrative agency. It is my fervent hope that a strict adherence to the Administrative Procedure Act in the making of findings of fact by agencies subject to that act mandated by Ark. Stat. Ann. § 5-710 (b) Supp. 1973 and *Arkansas Savings and Loan Association Board* v. *Central Arkansas Savings and Loan Association,* 256 Ark. 846, 510 S.W. 2d 872 (1974), will tend to relegate the courts to their proper role in judicial review.

I find evidence in the record which seems to me to be very substantial support for the finding by the board that the volume of business in the area in which the proposed association would conduct its business is not sufficient to indicate a successful operation. As we have previously noted, there must not only be sufficient savings deposits available, but there must also be an adequate market for sound loans to insure that the association can pay its operating expenses in addition to interest at a rate sufficiently high to draw and hold deposits. *Arkansas Savings and Loan Board* v. *Southerland,* 256 Ark. 445, 508 S.W. 2d 326 (1974). The majority has chosen to ignore the latter factor. Rather, it seems to take the position that the potential for success is enhanced by an increase in the amount of deposits pledged, which according to the applicants' certified public accountant were assured only by the signatures of the pledgors. Yet, this could be an additional burden and might tend to impede rather than hasten the success of the association if it should prove to be unable to make sufficient loans at an interest rate high enough to pay both the interest required on the deposits and the operating expenses.

It seems to me that it would be at least speculative to say that there would be sufficient mortgage loan demand to insure a sufficient volume of business to the proposed Grant County Savings and Loan Association to indicate a successful operation. The applicants' proposed budget and pro forma statement were prepared by a certified public accountant whose figures and methods had never been tested under actual operating conditions because none of the associations for whom he had prepared budgets had been in business for as long as one year. All of the figures in the budget were furnished to him by those proposed for management of the association, none of whom had any experience with a savings and loan association. In arriving at his gross operating income figure, he assumed a mortgage loan volume increasing to one million dollars by the end of the first year and no losses on mortgage loans during that time. He gave no basis for these assumptions.

Mortgage loan demand for such an institution seems to hinge largely upon demands for residential houses. While impressive statistics were given to show that Grant County population and economic growth had been exceeding state averages, there was substantial evidence to indicate that projections of these trends would be highly speculative. This should cause considerable doubt about the availability of adequate amounts of mortgage loans for appellees.

Part of the population increase may be attributed to the racial situation in more urban surrounding counties, and might be considered as a very unstable basis for predictions and projections or as permanent growth. It appeared that Leola and Prattsville, towns from which appellees expected to draw business, had population increases of 69 and 0 respectively, during the preceding decade, even though some residences were being built around Leola. Even though unemployment is relatively stable in the county, the average from 1960 to 1970 was 6.9% compared to a state average of 4.9% and a national average of 4.6%. In 1971 the rate was 5.8% opposed to an Arkansas average of 5.4% and in 1972 the Grant County avearge was 6.2%, slightly higher than the state average. Total employment increased by only 50 jobs during the preceding three years. Agricultural employment

was declining. A principal industry in Sheridan, employing 170 people had threatened to close its plant at the time of the hearing. Had this occurred, it would have taken four or five years to increase jobs in the area sufficiently to recover from this one loss, according to an expert witness for appellees. In spite of the fact that school enrollment had increased substantially and new buildings were being added to the school system, a request for a tax increase of five mills for maintenance and operation of schools was rejected by the voters. An inordinate number of employed residents (1200 of 3000) commute to work outside the county, most of them to Pulaski and Jefferson Counties. Windell R. Adams, the assistant director of the Southeast Arkansas Economic Development District, who prepared the economic data on the public need for the institution, would assume (rather logically) that *some* of these commuters do their banking business outside the county.

Adams stated it was difficult to project housing demand, but he attempted to do it by projecting the same percentage gain in housing units there had been between 1960 and 1970, in spite of the fact that he said the Research Center had only projected housing demand on a statewide basis, except for two metropolitan areas where there was a valid information basis. A footnote to his statistical data contained this statement: "If one assumes that 1960-70 population trends continue and the average number in each household remains at 3.1, there will be a need for 280 additional units in Grant County by 1980, substantially less than the 773 units projected above." Only 35 residential building permits were issued in Sheridan in 1972, one of which was for apartments. The manager of a 16-unit apartment building had virtually 100% occupancy until recently but had a few vacancies at the time of the hearing. One witness said it was more difficult to find a house to rent than to find one to buy.

There was no testimony that anyone had been unable to obtain a loan for residential purposes. The Grant County Bank in Sheridan, whose deposits had increased phenomenally during the preceding five years, had started making some loans with maturities up to 20 years. Residential loan volume, other than FHA or VA loans, amounted to about 30% of its total loans. From 1969 to 1972, this bank

made from 37.8% to 45.7% of the mortgage loans in Grant County. Other residential mortgages, with some exceptions, were made to savings and loan associations in Pine Bluff, Malvern, or Little Rock. Admittedly, the Grant County Bank cannot meet the total residential housing loan demand in Grant County, but there was evidence that the demands were being met. There are savings and loan associations in Pine Bluff, about 24 miles away, Malvern, about 25 miles away, Little Rock, about 33 miles away. Two builders testified on behalf of appellants. One of them stated that of 50 or 60 houses built by his concern, two-thirds were financed by loans made by Farmers Home Administration and the remaining one-third, most of which were priced above the Farmers Home Administration loan limit, were financed through loans made by the First Federal Savings and Loan Association in Pine Bluff. Each builder had one customer who financed his home by a loan from the Grant County Bank.

Of course, all the savings and loan associations which held the residential mortgages in the county which were of record in 1970, 1971, 1972 and 1973 were located outside the county. There is no indication that they could not or would not compete with a local association for loans or that they would not continue to make loans in like amounts. The same may be said about Farmers Home Administration and the other lenders making residential loans. Capital Savings and Loan Association had filed an application for the establishment of a branch office in Sheridan in 1972 but had later asked that action be withheld until it made request for further action. Dr. Charles Venus, an economist testifying on behalf of the appellants, stated that there was no way to ever keep out-of-county financial institutions from competing in the Grant County market.

Strangely enough, the person proposed as president of the proposed association voted, as a director of the Grant County Bank, to protest the application.

I would reverse the judgment of the Circuit Court and sustain the board.